van Gestel, Allan, J.
This matter is before the Court on the Plaintiff PharMetrics, Inc.’s Motion for Partial Summary Judgment, Paper #25. The motion seeks summary judgment on Counts I and II of the Complaint and Counts One and Three of the First Amended Counterclaim.
BACKGROUND
The underlying litigation is predicated on a certain Data Product License Agreement (the “License Agreement”), said to involve highly competitive and confidential trade secrets, entered into by the plaintiff, PharMetrics, Inc. (“PharMetrics”), and the defendant, NDCHealth Corporation (“NDC”), now known as Source Healthcare Analytics, Inc.[1]
PharMetrics requests that this Court enter an Order declaring that: (1) the acquisition of PharMetrics by IMS Health Incorporated (“IMS”) through PharMetrics’ merger with a wholly-owned subsidiary of IMS was not an “assignment” under the License Agreement between PharMetrics and NDC; (2) that PharMetrics has not violated the assignment clause or *527 any other provision of the License Agreement as a result of the acquisition by IMS; and (3) that NDC’s unjustified termination of the License Agreement constitutes a breach of the License Agreement.
The data licensed under the License Agreement is comprised of supposedly confidential and proprietary retrospective and prospective data on pharmacy claims, hospital claims, and physician claims on certain prescription products. NDC states that it obtains this data from pharmacies, hospitals, and physicians, de-identifies the data, repackages it to provide meaningful research analyses, and licenses it to customers, such as PharMetrics. These products are what is defined as the “Licensed Data Product” in Exhibit A attached to the License Agreement.
Lurking in the background is the fact that PharMetrics has recently been acquired by IMS, said by NDC to be its principal competitor in a “fierce” competitive and veiy limited market. NDC, therefore, fears that what it considers to be confidential information will get into the hands of its marketplace rival IMS.
Particular language in the License Agreement sets the stage for the present motion.
The License Agreement in Section 7, reads as follows:
No Rights to Publicize Relationship. LICENSEE shall neither reference nor utilize the name or logo of NDCHealth or any affiliate thereof, nor reference that this Agreement has been entered into or that there is a business relationship between LICENSEE and NDCHealth in any marketing or other materials of LICENSEE, without the prior express and specific written consent of NDCHealth. LICENSEE shall not disclose, identify or acknowledge NDCHealth as the source of the Licensed Data Product, provided that LICENSEE may disclose the source of such data (i) to prospective investors or their counsel or advisors in connection with a prospective acquisition or investment, so long as such parties agree to preserve the confidentiality of such information and (ii) to the extent required by law or regulation. In addition to any other right hereunder, NDCHealth shall have the right, without liability, to terminate this Agreement immediately upon LICENSEE’S violation of the foregoing sentence.
Section 8 of the License Agreement reads in material part as follows:
Proprietary Information. LICENSEE acknowledges that, as between NDCHealth and LICENSEE, the Licensed Data Product is proprietary to NDCHealth . .. and that NDCHealth regards the Licensed Data Product as a trade secret and that NDCHealth reserves all rights in same except those granted hereunder. LICENSEE agrees (i) that, except as provided herein, it shall not disclose the contents of the Licensed Data Product, (ii) it shall not sublicense, sell, transfer, or otherwise make available the Licensed Product to others except as set forth in Exhibit C, and (iii) that it will ensure that all persons having access through it to the Licensed Data Product are subject to contractual obligations that require they meet confidentiality standards consistent with LICENSEE’S obligations relating to the Licensed Data Product. . .
Section 13.1 of the License Agreement reads as follows:
Except as set forth in Section 13.2 and 13.3, LICENSEE may not sublicense, assign, or transfer this license, in whole or in part, without NDCHealth’s prior written consent, such consent not to be unreasonably withheld, and any attempt to sublicense, assign, or otherwise transfer any rights, duties or obligations hereunder is void. Each of the following events shall be deemed to constitute an assignment of this Agreement and each shall require the prior written consent of NDCHealthcare: (i) any assignment or transfer of this Agreement by operation of law; or (ii) any hypothecation, pledge, or collateral assignment of this Agreement; or (iii) any involuntary assignment or transfer of this Agreement in connection with bankruptcy, insolvency, receivership, or similar proceeding. Notwithstanding the foregoing, LICENSEE may transfer and assign this Agreement, without consent of NDCHealth, to any entity which acquires LICENSEE or all or substantially all of the stock or assets of LICENSEE; provided under no circumstances may LICENSEE assign this Agreement, in whole or in part, without written consent from NDCHealth, to IMS Health Incorporated, Verispan, LLC, Quin-tiles Transnational Corp., Aetna Health Information Solutions or Kaiser, including any of their related subsidiaries.
Sections 13.2 and 13.3 are not significant to the present motion.
NDC claims that PharMetrics violated these three foregoing sections and, therefore, has purported to terminate the License Agreement.
Section 14 of the License Agreement is an integration clause, and it establishes a choice of law to be applied thereto. It read, in material part, as follows:
This Agreement is governed by the laws of the State of Georgia, without regard conflicts of laws provisions. This Agreement contains the full understanding of the parties with respect to the subject matter hereof and supersedes all prior oral and written communications. No waiver, alteration or modification of any of the provisions hereof shall be binding unless in writing and signed by officers of both parties . . .
In an affidavit of David C. Lubner, Vice President, Finance & Administration and Chief Financial Officer of PharMetrics, the IMS acquisition and the status of the License Agreement is explained as follows:
*528 On June 14, 2005, IMS Holding Corp., a wholly-owned subsidiary of IMS, merged with and into PharMetrics, and PharMetrics became a wholly-owned subsidiary of IMS. The rights and obligations under the License Agreement remained with PharMetrics.
*****
PharMetrics has not assigned the License Agreement to IMS, nor has it shared the Licensed Data Product with IMS.
No countervailing affidavit, deposition testimony or documentary evidence has been presented by NDC.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving parly is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). “(T)he moving parly must establish that there are no genuine issues of material fact, and that the non-moving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
Mass.R.Civ.P. Rule 56(e). See, e.g., Godbout v. Cousens, 396 Mass. 254, 261-62 (1985); A. John Cohen Ins. Agency, Inc. v. Middlesex Ins. Co., 8 Mass.App.Ct. 178, 181-83 (1979).
The Court begins its analysis with an examination of key provisions of Georgia law. Under that law, “(t]he construction, interpretation and legal effect of a contract ... is an issue of law” to be decided by the Court. Savannah Jaycees Foundation v. Gottlieb, 615 S.E.2d 226, 228 (Ga.Ct.App. 2005). “First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning.” Woody’s Steaks, LLC v. Pastoria, 584 S.E.2d 41, 43 (Ga.Ct.App. 2003). No construction is necessary or even permissible. See R.S. Helms v. GST Dev. Co., 219 S.E.2d 458, 460 (Ga.Ct.App. 1975). Only if the Court determines the contract to be ambiguous does it move beyond the contract’s clear terms.
The Court of Appeals of Georgia summed up the law in this regard in Caswell v. Anderson, 527 S.E.2d 582, 584 (Ga.Ct.App. 2000):
Interpretation of a contract involves three steps. First, the court decides if the contract language is unambiguous, and if so the court enforces the contract’s clear terms. Second, if the contract is ambiguous, the court must apply the rule of contract construction to resolve the ambiguity. And third, if the ambiguity remains after use of the construction rules, the meaning of the contract must be decided by a jury.
Here, Section 14 of the License Agreement, by its terms, states that it contains “the full understanding of the parties with respect to the subject matter [t]hereof and supersedes all prior oral and written communications.” And Georgia law suggests that to look at extrinsic or parol evidence of the parties’ subjective intentions, course of performance or understanding arrived at subsequent to the contract is inadmissible and reversible error. Ga. Code Ann. sec. 13-2-2; Schluter v. Perrie, Buker, Stagg & Jones. P.C., 498 S.E.2d 543, 545 (Ga.Ct.App. 1998).
Applying the foregoing Georgia law, this Court examined the License Agreement. For the purposes presented by PharMetrics’ motion, the contract language is unambiguous.
There are two different kinds of limitations spelled out in the License Agreement. Sections 7 and 8 deal with what is called the “Licensed Data Product.” The phrase “Licensed Data Product” is a defined phrase in the License Agreement. It is “the data records more particularly described on Exhibit A attached (t)hereto and incorporated [t]herein by this reference.” See License Agreement, RECITALS, sec. 1. The present motion does not deal with the Licensed Data Product, but rather focuses on the License Agreement itself.
It is Section 13 that deals with the License Agreement itself. The Court, therefore, must enforce the contract’s clear terms as found in Section 13.
The Court repeats, in pertinent part, its quotation from Section 13.1.
Except as set forth in Section 13.2 and 13.3, LICENSEE may not. . . assign . . . this license, in whole or in part, without NDCHealth’s prior written consent . . . Each of the following events shall be deemed to constitute an assignment of this Agreement . . . : (i) any assignment or transfer of this Agreement by operation of law; or (ii) any hypothecation, pledge, or collateral assignment of this Agreement; or (iii) any involuntary assignment or transfer of this Agreement in connection with bankruptcy, insolvency, receivership, or similar proceeding. Notwithstanding the foregoing, LICENSEE may . . . assign this Agreement, without consent of NDCHealth, to any entity which acquires LICENSEE or all or substantially all of the stock or assets of LICENSEE; provided under no circumstances may LICENSEE assign this Agreement, in whole or in part, ... to IMS Health Incorporated,... including any of [its] related subsidiaries.
*529 The PharMetrics merger, in which it became a wholly-owned subsidiary of IMS was not a hypothecation, pledge, or collateral assignment of this Agreement; nor an involuntary assignment or transfer of the License Agreement in connection with any bankruptcy, insolvency, receivership, or similar proceeding.
Was it, however, “any assignment or transfer of [the License] Agreement by operation of law”? Recent Georgia law says it was not. In Ward v. City of Cairo, 583 S.E.2d 821 (Ga. 2003), the court ruled that in a merger situation “the successor corporation succeeds to the rights and privileges of the constituents unless some rule of law provides otherwise.” The court went on to rule that because the rights and duties under a nonassignable contract “vested in . . . [the] successor corporation, there was no assignment of the contract.” Id. at 824.
This case is stronger than that in Ward. In Ward the merger produced a new entity and the Georgia court still found no assignment. Here, PharMetrics remained as the surviving corporation and has since retained the License Agreement.
Further, Georgia Statute Sec. 14-2-1106 makes clear that a merger, such as occurred here, does not constitute an assignment. The statute reads;
(a) When a merger governed by this article takes effect:
*****
(2) The title to all real estate and other property owned by, and every contract right possessed by, each corporation or entity party to the merger is vested in the surviving corporation or entity without reversion or impairment, without further act or deed, and without any conveyance, transfer, or assignment having occurred . . .
PharMetrics is the surviving corporation in the merger with IMS Holding Corp.
Thus, both Georgia case law and Georgia statutory law make clear that the merger is not an assignment of the License Agreement by operation of law. NDC could have prevented the merger between PharMetrics and IMS Holding Corp. by simply saying so in the License Agreement. It did not. Rather, NDC barred PharMetrics from “assign[ing]" the License Agreement; which it has not done.
Here, where NDC, a sophisticated and knowledgeable entity, chose to embody its licensing relationship with PharMetrics in a detailed and carefully crafted written instrument, perhaps more than in other situations, it is entitled to and should be held to the contractual language it chose. The Court should be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument modify its expressed statements. “Courts cannot[, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
There is no place for NDC’s claim for breach of an implied covenant of good faith and fair dealing when, as here, there is no breach of the underlying agreement itself. In Georgia such a breach can come about “where a decision is left to the discretion of a designated entity.” Automatic Sprinkler Corp. v. Anderson, 257 S.E.2d 283, 284 (Ga. 1979). “Whenever the cooperation of the promisee is necessary for the performance of the promise, there is a condition implied that the cooperation will be given.” Southern Business Machines of Savannah, Inc. v. Norwest Fin. Leasing, Inc., 390 S.E.2d 402, 405 (Ga.Ct.App. 1990). Consequently, “the degree to which a party to a contract may invoke the protections of the covenant turn on the extent to which the contracting parties have defined their expectations and imposed limitations on the exercise of discretion through express contract terms.” Smith v. Grand Canyon Expeditions Co., 84 P.3d 1154, 1160 (Utah 2003) (discussing similar claim under Utah law).
There is no element of discretion in the License Agreement here. The breaches that NDC alleges are breaches of express provisions of the contract, not some abuse of discretion. It was not, however, a breach for PharMetrics to merge with IMS. The breach would only occur if there was an “assignment” of the License Agreement, and the merger was not an assignment. Those alleged breaches, it should be noted, are covered in the breach of contract count and should not be redundantly repeated in the guise of an implied covenant.
There being no breach of the License Agreement by PharMetrics, there comes a breach by NDC for attempting to terminate the License Agreement in the manner that it did.
ORDER
For the foregoing reasons, Plaintiff PharMetrics, Inc.’s Motion for Partial Summary Judgment, Paper #25, is ALLOWED and summary judgment is granted on Counts I and II of the Complaint and Counts One and Three of the First Amended Counterclaim.
When final judgment is entered there shall be included a declaration under Count I of the Complaint and Count One of the First Amended Counterclaim to the effect that: (1) the IMS acquisition of PharMetrics, through PharMetrics’ merger with IMS Holding Corp., was not an “assignment” of the License Agreement; (2) PharMetrics has not violated the assignment clause of the License Agreement as a result of the acquisition by IMS; and (3) NDC’s termination of the License Agreement because of PharMetrics’ acquisition by IMS constitutes a breach of the License Agreement.

The parties have stipulated to the substitution of Source Healthcare Analytics, Inc. as the party defendant, as appearing in the caption above. The Court, however, will refer to it as NDC because so much of the underlying documentation uses the latter name.